UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CONCRETE JUNGLE, LLC and
GREAT EXPECTATIONS, LLC                          Case No. 16-14114

        Plaintiffs,                          Honorable Nancy G. Edmunds

v.

ICON COMMERCIAL LENDING, INC.,
RANDALL J. FARR, and
BRENT WATSON

        Defendants.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS [20]

Plaintiffs' suit arises out of a funding relationship between the parties whereby Defendant ICON Commercial Lending, Inc. ("ICON") would assist Plaintiffs Concrete Jungle, LLC ("Concrete Jungle") and Great Expectations, LLC ("Great Expectations") in securing financing for the acquisition and development of apartment buildings in Flint, Michigan. Plaintiffs allege that Defendants ICON and its two principals, Randall J. Farr ("Farr") and Brent Watson ("Watson") never had a legitimate lending or brokerage business or the ability to secure the funding they promised, and that Plaintiffs were the victims of Defendants' advance fee scam. Plaintiffs claim that Defendants induced them into entering fraudulent agreements; paying Defendants $235,000.00 in fees, which Defendants stole; and paying third parties $240,000.00 in earnest money deposits, which Plaintiffs lost, in reliance on Defendants' false statements. Plaintiffs allege breach of contract, fraud, and negligent misrepresentation. They seek to recover the aforementioned amounts, plus

interests, costs, and attorneys fees.

Currently before the Court is Defendants' motion to dismiss. (Dkt. # 20). For the reasons stated below, this Court GRANTS IN PART and DENIES IN PART Defendants' motion.

## I.    FACTS

According to the Complaint, Plaintiffs are Michigan limited liability companies and real estate investors who decided to join forces to acquire and develop several apartment buildings in Flint, Michigan. Plaintiffs sought out commercial lenders to finance this project and selected Defendant ICON, which represented that it was a "full-service private direct commercial lender." ICON is a Utah-based company. Defendant Farr resides in New York and Arizona, and Defendant Watson resides in Hawaii.

On January 9, 2015, Concrete Jungle and ICON entered into a Fee Agreement. (Dkt. # 1-2). On February 4, 2015, Concrete Jungle and ICON signed an Addendum to the Fee Agreement. (Dkt. # 1-3). Pursuant to the Fee Agreement and Addendum, ICON agreed to "exercise reasonable commercial efforts to provide a suitable financing solution within the terms of this Agreement" but did not guarantee approval of final underwriting or that the loan would close. (Dkt. # 1-2 at 5). Concrete Jungle agreed to deposit $235,000.00 into "a mutually acceptable escrow account." *Id.* at 6; Dkt. # 1-3 at 3. ICON agreed to "provide sufficient financial securities" into the same escrow account as a safeguard against ICON not performing as agreed. (Dkt. # 1-2 at 6).

On March 2, 2015, Concrete Jungle and ICON signed Escrow Instructions directing release of $12,500.00 to ICON for travel expenses and due diligence fees. (Dkt. # 1-4). On March 3, 2015, Concrete Jungle and ICON signed further Escrow Instructions directing

release of $112,500.00 to ICON for Concrete Jungle's "Loan Funding Participation." (Dkt. # 1-5). On March 6, 2016, ICON submitted a Letter of Commitment addressed to Concrete Jungle and signed by Defendant Farr. (Dkt. # 1-6). This letter refers to a Funding Agreement "wherein ICON has made an Irrevocable and Firm Commitment to Provide Project Funding in the amount of Twelve Million Dollars." The letter states that "ICON's completion and approval of this loan is based solely upon ICON's discretion" and that initial funding is anticipated to be disbursed by April 15, 2015. The letter further states: "Please note that while the foregoing sets forth the general summary of the transaction, final written agreements between the parties will necessarily include such other terms and conditions as may be required by ICON or recommended by either party's counsel."

On March 31, 2015, Concrete Jungle, Great Expectations, and ICON entered into a Joint Venture Agreement. (Dkt. # 26-9). The parties established a new business entity for the joint venture, Pleasant Peninsula Investments, LLC ("PPI"). According to the Joint Venture Agreement, "[t]his entity was formed for the specific purpose of this Project's business operations and completing Project's financing." The Joint Venture Agreement provided ICON with thirty five percent equity ownership, "effective upon funding."

Also on March 31, 2015, ICON and PPI entered into a Funding Agreement. (Dkt. # 1-8). ICON agreed to fund the Flint project in the amount of twelve million dollars, but the Funding Agreement does not provide a specific date by which the financing has to be obtained. PPI agreed to use the funds to purchase "various multi-family apartment properties and to pay off Project mezzanine lender and other third party obligations (if applicable)." PPI also agreed to place $235,000.00 into escrow "for the purpose of paying a portion of Project's one-time financing expenses."

3

The Complaint alleges that Concrete Jungle placed $235,000.00 into escrow on April 7, 2015, and that the funds were released to ICON on or before May 4, 2015. The Complaint further alleges that ICON placed into escrow five Brazilian Petrobas Oil Bonds, which it represented were worth $55 million dollars, but which were actually worthless.

Plaintiffs allege that Defendants entered into all of these agreements in bad faith and without any intent or ability to perform. According to Plaintiffs, Defendants' intent was solely to collect the $235,000.00 in fees. From May 2015 through the end of the year, Defendants blamed delays in securing funding on the Greek financial crisis, problems with the bank guarantee issuer's litigation in Europe, travel problems to and from Hong Kong, travel problems within Europe, health problems, and holidays. In the meantime, Plaintiffs paid $240,000.00 as earnest money deposits to third parties with whom they had contracts to purchase property, in reliance on Defendants' representations that financing was forthcoming.

On December 15, 2015, Plaintiffs allegedly notified ICON that ICON was in default. On January 18 and February 2, 2016, Plaintiffs demanded a return of the $235,000.00 fee and reimbursement of some of the earnest money deposits that Plaintiffs had paid to third parties, plus interest. According to the Complaint, the parties agreed that ICON would wire a $310,000.00 refund to Plaintiffs. Defendant Farr confirmed this in an e-mail dated April 20, 2016. (Dkt. # 1-9). Plaintiffs allege that from that date to the present date, Farr has repeatedly lied about his plan to refund the $310,000.00. Plaintiffs attach to the Complaint a series of e-mails from Farr, sent from April 2016 through November 2016, which provide a number of excuses for the delay in securing funding for the project and providing the refund. (Dkt. # 1-9 to 1-24). These include the non-performance of third parties; problems

with the bank guarantee issuer's litigation; bank policies and delays; bank attorney delays; "red tape" caused by the government; complexity of sophisticated transactions and the "nature of the beast;" ongoing negotiations with various financial institutions in other states and abroad; and time required for unspecified transactions to begin paying out, for encrypted messages to travel from one financial institution to another, and for monetization and disbursement processes to be completed. Plaintiffs attach an e-mail from Defendant Watson, dated September 22, 2016, which also references $310,000.00. (Dkt. # 1-16).

Defendants have yet to complete the refund or provide any financing to Plaintiffs or to PPI. Defendants claim that they have made and continue to make every possible effort to secure financing for the Flint project.

## II.  ANALYSIS

Defendants move to dismiss for lack of subject matter jurisdiction, for lack of personal jurisdiction, pursuant to arbitration clauses, and pursuant to a forum selection clause.

### A.  Subject Matter Jurisdiction

Defendants first argue that PPI is a necessary and indispensable party to this action, and that the Court should dismiss this case because joinder of PPI divests this Court of subject matter jurisdiction.

Subject matter jurisdiction is governed by Fed. R. Civ. P. 12(b)(1).  A motion to dismiss pursuant to Rule 12(b)(1) may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction.  *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). A facial attack challenges the pleading itself. In considering this type

of attack, the court must take all material allegations in the complaint as true, and construe them in the light most favorable to the non-moving party. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). When a defendant challenges subject matter jurisdiction on a factual basis, the plaintiff has the burden of proving jurisdiction in order to survive the motion. *Moir v. Greater Cleveland Regional Transit Authority*, 895 F.2d 266, 269 (6th Cir. 1990). "In reviewing a 12(b)(1) motion, the Court may consider evidence outside the pleadings to resolve factual disputes concerning jurisdiction, and both parties are free to supplement the record by affidavits." *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003) (citation omitted).

The question of joinder under Fed. R. Civ. P. 19 and dismissal for failure to join an indispensable party under Fed. R. Civ. P. 12(b)(7) involves a three-step inquiry. *Keweenaw Bay Indian Cmty. v. State*, 11 F.3d 1341, 1345 (6th Cir. 1993). First, the Court must determine whether an absent party is necessary under Rule 19(a), which provides as follows.

> (a) Persons Required to Be Joined if Feasible.
>
> (1) Required Party. A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:
>
>> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>>
>> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>>
>>> (i) as a practical matter impair or impede the person's ability to protect the interest; or

(ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a). Second, the Court must determine whether joinder is feasible. *See Keweenaw*, 11 F.3d at 1345. If the absent party is necessary but joinder would be infeasible, then the Court proceeds to the third step and must decide whether the absent party is indispensable under Rule 19(b), which provides as follows.

> (b) When Joinder Is Not Feasible. If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
>
> > (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> >
> > (2) the extent to which any prejudice could be lessened or avoided by:
> >
> > > (A) protective provisions in the judgment;
> > >
> > > (B) shaping the relief; or
> > >
> > > (C) other measures;
> >
> > (3) whether a judgment rendered in the person's absence would be adequate; and
> >
> > (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).

The Sixth Circuit has instructed that Rule 19 should not be applied in a rigid manner, but rather, according to the practicalities of the individual case. *Keweenaw*, 11 F.3d at 1346. "Ideally, all [the] parties would be before the court. Yet Rule 19 calls for a pragmatic approach; simply because some forms of relief might not be available due to the absence of certain parties, the entire suit should not be dismissed if meaningful relief can still be

accorded." *Smith v. United Bhd. of Carpenters & Joiners of Am.*, 685 F.2d 164, 166 (6th Cir. 1982).

Defendants facially attack Plaintiffs' pleadings and argue that PPI is both necessary and indispensable to this case because only PPI and ICON are parties to the Funding Agreement. Defendants argue that therefore only PPI may bring a claim for breach of the Funding Agreement. Defendants further argue that the necessary joinder of PPI divests this Court of diversity jurisdiction because ICON is both a defendant and a member of PPI.

Plaintiffs respond that PPI was the creation of Defendants' fraudulent scheme and its existence should be disregarded. Plaintiffs note that PPI has never had operational or financial activity of any kind, and that ICON never received equity ownership, since that was to be effective upon funding that never occurred. Plaintiff further note that all other agreements were between ICON and Concrete Jungle. Plaintiffs argue that all of the contracts were fraudulently induced and are therefore voidable.

To determine whether PPI is a necessary party under Rule 19(a), the Court first considers whether it can accord complete relief among the existing parties. Complete relief can generally be fashioned in the absence of a joint venture where, as here, all of the members of a joint venture are present before the Court . *See VMS/PCA Ltd. P'ship v. PCA Partners Ltd. P'ship*, 727 F. Supp. 1167, 1170-71 (N.D. Ill. 1989). In addition to breach of contract, Plaintiffs claim damages as a result of Defendants' misrepresentations and fraud, and they allege that the creation of PPI itself was part of Defendants' fraudulent scheme. Defendants have failed to show that complete relief could not be afforded without joinder.

The Court next considers whether a reasonably likely outcome of this action could impair PPI's ability to protect any claimed interest relating to the subject of this action. Given that all of PPI's members are present before the Court, PPI is aware of this action; yet PPI has not moved to join or intervene, or otherwise claimed any interest in this action. Defendants do not contend and nothing in the record indicates that PPI was ever operational or ever engaged in any financial activity. Defendants have not shown how a judgment in this case would affect the rights of PPI in the future and do not seriously argue that PPI's interests would be prejudiced.

Lastly, the Court considers whether PPI's absence from this litigation could subject Defendants to a substantial risk of incurring multiple or inconsistent obligations. Plaintiffs in this case seek to recover the $235,000.00 in fees that Plaintiffs (not PPI) paid to ICON and the $240,000.00 in earnest money deposits that Plaintiffs (not PPI) paid to third parties in reliance on Defendants' alleged misrepresentations. The Fee Agreement, Addendum, and Escrow Instructions were all signed by Concrete Jungle, before PPI came into existence, and the Complaint alleges that Concrete Jungle was the entity that placed the $235,000.00 in escrow. Plaintiffs claims are distinct from any claims that PPI would have. Defendants have not demonstrated that a substantial risk of multiple or inconsistent obligations without joinder is likely.

Accordingly, the Court concludes that PPI is not a necessary party under Rule 19(a), and the Court need not go any further. Defendants motion to dismiss for failure to join a necessary party and lack of subject matter jurisdiction is denied.

## B. Personal Jurisdiction

Defendants next argue that the Court should dismiss this case because the Court lacks personal jurisdiction over Defendants.

Rule 12(b)(2) provides for a motion to dismiss for lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). The party seeking to establish personal jurisdiction bears the burden of proving that the jurisdiction exists. *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir.1991) (citing *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)). When deciding such a motion, the court may "determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Serras v. First Tennessee Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989). The parties in this case have not requested preliminary discovery or an evidentiary hearing on the jurisdictional issues. Accordingly, the Court proceeds solely on the basis of the facts alleged in the pleadings, motions, and affidavits filed.

When a court rules on a motion to dismiss for lack of personal jurisdiction without holding an evidentiary hearing, "the court must consider the pleadings and affidavits in the light most favorable to the plaintiff. To defeat such a motion, the plaintiff need only make a prima facie showing of jurisdiction. Furthermore, a court does not weigh the controverting assertions of the party seeking dismissal." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) (citing *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996)).

The Michigan long-arm statute provides for limited personal jurisdiction over individuals and corporations who transact business in Michigan in cases arising out of such business transactions. Mich. Comp. Laws Ann. §§ 600.705, 600.715. The application of this statute is limited by constitutional concerns of due process. *Onderik v. Morgan*, 897 F.2d 204, 208 (6th Cir. 1989); *Theunissen*, 935 F.2d at 1459. To exercise personal jurisdiction over a defendant, the defendant must have had minimum contacts with the forum so that the exercise of jurisdiction would comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1944).

Defendants argue that they have not had a sufficient level of contact with Michigan to create personal jurisdiction over them. Defendants argue that their contacts with Michigan were limited to communications that originated outside the state, and that they conducted no activities in Michigan. Defendants maintain that they have only provided services to a single client in Michigan, but never from within Michigan (though Defendants concede that Farr traveled to Michigan once). Defendants further argue that ICON's membership interest in PPI, a Michigan LLC, cannot create jurisdiction over Farr or Watson individually.

Plaintiffs respond that Defendants did not just make phone calls and write letters; rather, they initiated a commercial loan transaction and agreed to finance real estate projects in Michigan. Plaintiffs note that, if Defendants are right, they intended to become joint venturers in a Michigan business through PPI, a Michigan LLC. Plaintiffs argue that their fraud tort claim arises directly from the Defendants' activity in Michigan, and that

people who defraud Michigan residents can hardly be heard to complain about being sued in Michigan and having to travel to Michigan to defend themselves.

### 1. Does Michigan's Long-Arm Statute Provide Personal Jurisdiction Over ICON?

Michigan's long-arm statute provides for limited personal jurisdiction over a corporation that transact business in Michigan in cases arising out of such business transactions. Mich. Comp. Laws Ann. § 600.715. The Sixth Circuit has instructed that the "arising out of" requirement "is met if the cause of action was 'made possible by' or 'lies in the wake of' the defendant's contacts with the forum state." *Citizens Bank v. Parnes*, 376 F. App'x 496, 501 (6th Cir. 2010) (citing *Lanier v. American Bd. of Endodontics*, 843 F.2d 901, 909 (6th Cir.1988)). Under Michigan law, the court can exercise limited personal jurisdiction over a corporation in pertinent part if the action arises out of "(1) [t]he transaction of any business within the state" or "(2) [t]he doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort." Mich. Comp. Laws Ann. § 600.715. The Michigan Supreme Court, in construing its long arm statute applicable to foreign corporations, said that "the transaction of any business . . . includes 'each' and 'every' . . . [i]t comprehends the slightest." *Serras v. First Tennessee Bank Nat. Ass'n*, 875 F.2d 1212, 1217 (6th Cir. 1989) (quoting *Sifers v. Horen*, 385 Mich. 195, 199 n.2 (1971)). "Neither the presence of the defendant in the state, nor the actual contract formation need take place in the forum state for the defendant to do business in that state." *Lanier*, 843 F.2d at 907.

ICON maintains that Plaintiffs are its only Michigan clients and that all communications with Plaintiffs occurred from outside the state. Nevertheless, ICON initiated a commercial loan transaction with Michigan residents, agreed to secure financing for real estate projects in Michigan, and initiated the formation of PPI, a Michigan LLC and joint venture entity of which ICON became a member in order to obtain equity ownership in property located in Michigan. ICON further invited Plaintiffs to pay a significant fee via communications sent to Michigan. ICON's owner and Managing Director, Defendant Farr, also traveled to Michigan, in his words, "to meet Plaintiffs and sign documents with Chase Bank on behalf of PPI." (Dkt. # 20-5). According to Farr's affidavit, ICON continues to make every possible effort to secure financing for real estate projects in Michigan and presumably to obtain equity ownership in those properties in Michigan through the joint venture. The record indicates that, over the past several years, ICON has responded to many requests from Plaintiffs for updates on progress toward securing financing for the project in Michigan. Taking all the facts alleged in the light most favorable to Plaintiffs, ICON transacted some business in Michigan within the meaning of Michigan's long-arm statute. *Cf. Lanier*, 843 F.2d at 908. The alleged breach of contract, fraud, and misrepresentation that Plaintiffs complain of plainly arose out of this business transacted in Michigan.

According to Plaintiffs, ICON also defrauded Michigan residents through an advance fee scheme--without any intention of performing under the aforementioned agreements, and without the ability to do so, in order to collect $235,000.00 in fees that were wired from Michigan. Taking all the facts alleged in the light most favorable to Plaintiffs, ICON's e-mailing or otherwise sending of the allegedly fraudulent fee, escrow, and funding

agreements to Michigan satisfies subsection (2) of Michigan's long-arm statute. *Cf. Flagstar Bank, FSB v. Mortg. Loan Specialists*, No. 10-10889, 2010 WL 3862746, at *9 (E.D. Mich. Sept. 28, 2010).

### *2. Does the Exercise of Jurisdiction Over ICON Comport With Due Process Requirements?*

The Court turns to determining whether the exercise of personal jurisdiction over ICON would comport with due process. In determining whether a nonresident defendant has had sufficient contacts to support personal jurisdiction, three criteria apply:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968).

#### a. Has ICON purposefully availed itself of the privilege of acting in Michigan or causing a consequence in Michigan?

The Supreme Court has found purposeful availment

> where the contacts with the forum state proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State. Thus, where the defendant 'deliberately' has engaged in significant activities within a state, or has created 'continuing obligations' between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and . . . it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985) (emphasis in original) (citations omitted). "The question of which party solicited the business interface is irrelevant, so long as the defendant then directed its activities to the forum resident." *Lanier*, 843 F.2d at 910.

Contracting with a forum resident alone is not sufficient to support the exercise of personal jurisdiction. "Rather, prior negotiations, contemplated future consequences, the terms of the contract, and the actual course of dealing need be addressed to evaluate, in a 'highly realistic' way, the intended future consequences that are 'the real object of the business transaction.'" *Id.* In *McGee v. Int'l Life Ins. Co.*, the Supreme Court held that the issuance of a single life insurance policy to a California resident was sufficient to justify the exercise of personal jurisdiction over a party located in Texas. 355 U.S. 220, 223 (1957) ("It is sufficient for purposes of due process that the suit was based on a contract which had substantial connection with that State. . . . The contract was delivered in California, the premiums were mailed from there and the insured was a resident of that State when he died."). In *CompuServe*, the Sixth Circuit found that Ohio had personal jurisdiction over a Texas resident who had purchased a subscription from CompuServe and then sent computer software over the internet to the CompuServe system in Ohio. 89 F.3d at 1264-66.

As discussed above, it is evident in this case that ICON itself took actions that created a connection with Michigan. The Court further finds that the connection with Michigan is substantial enough that ICON should reasonably have anticipated being haled into a Michigan court. ICON reached beyond Utah to contract with Michigan LLCs for the

financing of real estate property in Michigan. ICON then went a step further and initiated the creation of PPI, a Michigan LLC and joint venture entity of which ICON became a member in order to obtain equity ownership in property located in Michigan. This indicates that ICON intended to create a relationship with Michigan residents that was ongoing in nature–not random, fortuitous, or attenuated.

Further, ICON should have reasonably foreseen that the transaction with Plaintiffs would have consequences in Michigan, given that Plaintiffs are real estate investors in Michigan and the transaction was meant to secure financing for the acquisition and development of apartment buildings in Michigan. Under Defendants' version of the facts, the real object of the transaction appears to be to finance and acquire ownership interest in real property in Michigan, and to acquire fees from Michigan residents to offset costs. Under Plaintiffs' version of the facts, the real object of the transaction was to defraud Michigan residents in order to collect an advance fee without any intention or ability to provide any service. Under either version, ICON's contacts with Michigan have ongoing, far-reaching consequences in Michigan.

Defendants make much of the fact that the Fee Agreement and Funding Agreement were not entered into in Michigan and contain provisions indicating that they are to be construed under Utah and Arizona law respectively; however, these factors are not dispositive. *See Lanier*, 843 F.2d at 907 (noting that contract formation need not take place in the forum state); *Burger King*, 471 U.S. at 481-82 (explaining that, while choice of law provisions should not be ignored, such provisions standing alone are insufficient to determine jurisdiction). Plaintiffs allege that the Fee Agreement and Funding Agreement

were obtained through fraud, and that ICON's Utah address is nothing more than a commercial mailbox. The record indicates that ICON welcomed business from Michigan residents; ICON chose to contract with Michigan residents; the agreements were delivered in Michigan; Plaintiffs paid ICON a $235,000.00 fee from Michigan, and the transaction concerned financing a real estate project in Michigan.

Viewing the facts in the light most favorable to Plaintiffs, the Court finds that ICON purposefully availed itself of the privilege of acting in Michigan or causing a consequence in Michigan.

### b. Does the cause of action arise from ICON's activities in Michigan?

In order to find the exercise of jurisdiction over ICON proper, the Court must also find that Plaintiffs' claims against ICON arise from ICON's activities in Michigan. "If a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *CompuServe*, 89 F.3d at 1267 (citations omitted).

The cause of action in this case concerns allegations of breach of contract, fraud, and negligent misrepresentation. ICON's contacts with Michigan are plainly related to the operative facts of this controversy. Plaintiffs claim that ICON was never a legitimate lending or brokerage business and never had the ability to secure financing as promised. Plaintiffs allege that they are victims of ICON's advance fee scam. Plaintiffs claim that ICON induced them into entering fraudulent agreements; paying ICON $235,000.00 in fees, which ICON stole; and paying third parties $240,000.00 in earnest money deposits to purchase real

estate property in Michigan, which Plaintiffs lost, in reliance on ICON's false statements. Viewing the facts in the light most favorable to Plaintiffs, it is possible that ICON's activities in Michigan have caused economic harm in Michigan, and such a causal connection satisfies the "arising from" requirement. *See Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 892 (6th Cir. 2002).

### *c. Do the acts of ICON or consequences caused by ICON have a substantial enough connection with Michigan to make the exercise of jurisdiction over ICON reasonable?*

Where the Court finds, as it has in this case, that the purposeful availment and "arising from" requirements are met, then an inference arises that the reasonableness requirement is also present. *CompuServe*, 89 F.3d at 1268  (citations omitted). "[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477.

The Court finds that ICON has failed to demonstrate how jurisdiction in Michigan would be fundamentally unfair. Defendants claim that litigating in Michigan would be burdensome because ICON does not reside or conduct business in Michigan; however ICON did transact business in Michigan as discussed above. It is not unfair to require a corporate defendant to defend against fraud and misrepresentation claims in Michigan arising from an ongoing business relationship and business dealings with Michigan residents. Defendants also argue that Michigan has little to no interest in this case because of the choice of law provisions in the Fee Agreement and Funding Agreement; however,

as discussed above, these are not dispositive. Michigan has a substantial interest in protecting its residents from fraud and the resulting economic harm that may likely result within its boundaries.

Viewing the facts in the light most favorable to Plaintiffs, the Court concludes that Plaintiffs have alleged sufficient facts to make out a *prima facie* case that ICON is subject to personal jurisdiction based on ICON's contacts with Michigan.

### 3. Does the Court Have Personal Jurisdiction Over Farr and Watson?

As the Supreme Court has explained, "jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him . . . . Each defendant's contacts with the forum State must be assessed individually." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984). "[W]here an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; i.e., whether she purposely availed herself of the forum and the reasonably foreseeable consequences of that availment." *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 698 (6th Cir. 2000).

Under Michigan law, the court can exercise limited personal jurisdiction over an individual in pertinent part if the action arises out of "[t]he doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort." Mich. Comp. Laws Ann. § 600.705(2).

Plaintiffs allege that Farr and Watson are the two main principals of ICON. As to Farr, Plaintiffs claim that he started lying before the initial agreements between Plaintiffs and ICON were entered into and continued to lie through to the most recent e-mail promising to secure the financing for the real estate projects in Michigan. Plaintiffs allege that Farr sent e-mails to Michigan notifying Plaintiffs of delays in securing the promised financing, blaming the delays on a variety of different factors, and aggressively representing to Plaintiffs that ICON could and would obtain the financing for the real estate projects in Michigan as promised. In support of these allegations, Plaintiffs  attach to the Complaint a series of e-mails from Farr to Plaintiffs. Plaintiffs allege that Farr has repeatedly lied about this his plan to refund $310,000.00 to Plaintiffs. Plaintiffs claim that, at minimum, Farr was negligent in reporting facts to Plaintiffs as true when there was no reasonable basis for doing so, and that he did not perform any investigation or due diligence regarding the supposed sources of funds he promised to Plaintiffs. Under Mich. Comp. Laws Ann.  § 600.705, the alleged misrepresentations on the part of Farr are enough to establish jurisdiction over Farr. The alleged fraud and misrepresentations that Plaintiffs complain of plainly arose out of and were made possibly by the alleged tortious actions of Farr.

Viewing the facts in the light most favorable to Plaintiffs, Farr was the main participant in the alleged tortious conduct. Farr himself deliberately took actions that created a connection with Michigan. Farr reached beyond Arizona and/or New York to send agreements and contracts to Michigan residents for the financing of real estate property in Michigan. Farr was also personally involved in establishing PPI, the joint venture entity and Michigan LLC, and he traveled to Michigan to meet with Plaintiffs for this purpose.

According to Plaintiffs, Farr sent regular communications and documents to Michigan. In contrast to Watson's affidavit, Farr's affidavit goes into great detail regarding the agreements between the parties as well as his past and ongoing efforts to secure financing for Plaintiffs' project. Farr should have reasonably foreseen that these activities would have consequences in Michigan, given that Plaintiffs are real estate investors in Michigan and the transaction concerned secure financing for the acquisition and development of apartment buildings in Michigan. Plaintiffs allege that the real object of the transaction was to defraud Michigan residents in order to collect an advance fee without any intention or ability to provide any service. Farr should have reasonably foreseen that his activities and contacts with Michigan would have ongoing, far-reaching consequences in Michigan.

The cause of action against Farr concerns allegations of fraud and negligent misrepresentation. Farr's contacts with Michigan are plainly related to the operative facts of this controversy. Plaintiffs claim that ICON was never a legitimate lending or brokerage business and never had the ability to secure financing as promised, and that Farr repeatedly lied to them in order to induce Plaintiffs into entering fraudulent agreements and paying an exorbitant fee for no service whatsoever.

For these reasons, the Court concludes that Plaintiffs have alleged sufficient facts to make out a *prima facie* case that exercising jurisdiction over Farr comports with the requirements of due process.

Plaintiffs' allegations as to Watson, on the other hand, are vague and few. There is only one brief e-mail from Watson to Plaintiffs' attorney attached to the Complaint, which makes a vague reference to $310,000.00, which according to Plaintiffs is a reference to the

refund that was promised to them by Defendants. Plaintiffs do not make allegations regarding communications from Watson or any documents prepared by Watson, though his signature appears on some documents in the record, and his affidavit indicates that he participated in some communication with Plaintiffs from outside of Michigan. The Court concludes that Plaintiffs have failed to allege sufficient facts from which the Court could infer that Watson had individual or personal contacts with Michigan that would render jurisdiction over him appropriate. The Court will grant in part Defendants' motion to dismiss for lack of personal jurisdiction as to Defendant Watson only.

### C.  Arbitration Clauses

Defendants' next argument is that the Court should dismiss all claims against ICON and stay the remainder of the case pursuant to arbitration clauses in the Fee Agreement and Funding Agreement.

Section 2 of the Federal Arbitration Act ("FAA") provides that written arbitration agreements involving commerce "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2. Section 3 provides that

> [i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had . . . .

9 U.S.C. § 3. Section 4 allows a party aggrieved by another party's refusal to arbitrate to petition the district court to compel arbitration in accordance with the parties' arbitration agreement. *See* 9 U.S.C. § 4.

Pursuant to the FAA, a claim is arbitrable if: (1) there is a valid agreement to arbitrate; (2) the claim falls within the scope of the arbitration agreement; and (3) if the claim is statutory, it must not be one which the legislative body intended to be precluded from arbitration. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-28 (1985).

> [T]here is a general presumption of arbitrability, and any doubts are to be resolved in favor of arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Where the arbitration clause is broad, only an express provision excluding a specific dispute, or the most forceful evidence of a purpose to exclude the claim from arbitration will remove the dispute from consideration by the arbitrators.

*Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 576-77 (6th Cir. 2003) (internal quotations and citations omitted).

Defendants argue that the arbitration clauses in the Fee Agreement and Funding Agreement are valid and enforceable and cover Plaintiffs' breach of contract, fraud, and negligent misrepresentation claims against ICON. Plaintiffs respond that the March 6, 2015 Letter of Commitment does not contain an arbitration provision. Plaintiffs argue that there is no valid or enforceable arbitration provision in this case because all of the contracts were fraudulently induced and are therefore voidable.

Defendants correctly note that Plaintiffs alleged breach of the Fee Agreement and Funding Agreement in their Complaint. These agreements contain arbitration provisions. In their response, Plaintiffs attempt to switch course and rely exclusively on the Letter of Commitment, which does not contain an arbitration provision. However, the 2-page Letter of Commitment states: "Please note that while the foregoing sets forth the general summary of the transaction, final written agreements between the parties will necessarily include such other terms and conditions as may be required by ICON . . ." (Dkt. # 1-6 at 2). The Letter of Commitment is signed only by Farr, not by Plaintiffs. It contemplated other final written agreements, and it does not contradict the Fee Agreement or Funding Agreement. The Court agrees with Defendants that Plaintiffs' exclusive reliance on the Letter of Commitment is misplaced.

The Fee Agreement, dated January 9, 2015, states that it is between ICON and Concrete Jungle, and it is signed by Robert Loomis for and on behalf of Concrete Jungle, and Watson for and on behalf of ICON. (Dkt. # 1-2 at 12) This document states: "The purpose of this LOI / Fee Agreement is to provide a cursory understanding of the procedures involved . . . . We disclaim all responsibility and accept no liability (including negligence) for the consequences for any person acting, or refraining from acting, on such information prior to the receipt by those persons of subsequent written confirmation." *Id.* at 3. The Fee Agreement also includes the following provision: "In the event any dispute or controversy arises with respect to the subject matter of this Agreement or the transaction contemplated herein . . . CLIENT and ICON agree that such dispute or controversy shall

be settled by final, binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. . . ." *Id.* at 10.

The Funding Agreement, dated March 31, 2015, states that it is between ICON and PPI (identified as Client). The Funding Agreement is signed by Robert Loomis of Concrete Jungle and Jennifer Oliver of Great Expectations for and on behalf of Client, and it signed by Farr for and on behalf of ICON. The Funding Agreement includes the following provision.

**10.**     **ARBITRATION**

10.1     Any disputes or differences which may arise out of the Contract, or in connection with the performance of any of the obligations or duties hereunder, shall be settled as far as possible in an amicable way.

10.2     In the event that the parties cannot settle their dispute pursuant to Section 10.1, the Parties hereby agree to submit the dispute to be finally and exclusively settled in accordance with the applicable Rules of the American Arbitration Association ("AAA").

*Id.* at 10.

Plaintiffs' principal argument is that there is no valid agreement to arbitrate because all of the contracts were fraudulently induced and are therefore voidable. In *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, the Supreme Court held that a claim of fraud in the inducement of the entire contract is a matter to be resolved by the arbitrators, not federal courts. 388 U.S. 395, 403-03 (1967). A federal court may consider only claims relating to the making and performance of the arbitration clause itself. *Id.* The Sixth Circuit "has specifically rejected as insufficient allegations that the arbitration agreement was used to further a fraudulent scheme, where the plaintiff failed to identify any misrepresentations particular to the arbitration agreement separate from the contract as a whole." *Moran v.*

*Svete*, 366 F. App'x 624, 631 (6th Cir. 2010); *see also Glazer v. Lehman Bros.*, 394 F.3d 444, 453-54 (6th Cir. 2005) (holding that arbitration provisions are separable from void or voidable provisions of a contract because the FAA does not permit federal courts to examine the enforceability of contracts containing arbitration provisions).

Plaintiffs have not claimed that Defendants fraudulently induced them to enter into the agreement to arbitrate "[a]ny disputes or differences which may arise out of the [Funding Agreement], or in connection with the performance of any of the obligations or duties [t]hereunder;" or to enter into an agreement to arbitrate "any dispute or controversy [that] arises with respect to the subject matter of [the Fee] Agreement or the transaction contemplated [t]herein." This contractual language is broad enough to encompass Plaintiffs' claims that ICON breached the Funding Agreement and the Fee Agreement; that the agreements themselves were procured by fraud; and that ICON was negligent in reporting facts regarding the financing transaction that is at the heart of both agreements. *See Highlands Wellmont*, 350 F.3d at 577-78. Plaintiffs do not claim that they intended to exclude such claims from arbitration, or that they were not free to so contract.

At oral argument, Plaintiffs argued for the first time that the arbitration provision in the Fee Agreement is inconsistent with the applicable law provision in the Fee Agreement, which states: "This Agreement shall be governed by and construed in accordance with the laws of the State of Utah. If legal action is undertaken to enforce or declare in effect any provision of this Agreement, that legal action shall be venued in the Superior Court of Utah . . . ." (Dkt. # 1-2 at 10).

Courts in this district have noted that "[t]he Sixth Circuit has yet to address the relationship between forum-selection and arbitration clauses. However, several other circuits hold that choice-of-forum clauses are not inconsistent with, but rather complementary to arbitration provisions." *Spartech CMD, LLC v. Int'l Auto. Components Grp. N. Am., Inc.*, No. 08-13234, 2009 WL 440905, at *7 (E.D. Mich. Feb. 23, 2009); *Bova Properties, LLC v. Velocity Ventures, LLC*, No. 14-14602, 2015 WL 2125359, at *6 (E.D. Mich. May 6, 2015).

Plaintiffs contend that the Fee Agreement directs the parties to both arbitrate and sue in Utah. However, the plain language of the Fee Agreement states that any dispute that arises with respect to the subject matter of the Fee Agreement or the transaction contemplated in the Fee Agreement shall be settled by final, binding arbitration. And *if* legal action is undertaken, then it shall be venued in Utah. The applicable law provision that Plaintiffs rely on does not specifically preclude or even mention arbitration. The Court agrees with Defendants that the two provisions are not inconsistent. "Both can be given effect, for arbitration awards are not self-enforceable. They may only be enforced by subsequent judicial action. Thus, even if arbitration is completed, the forum selection clause would appear to dictate the location of any action to enforce the award." *See Patten Sec. Corp. v. Diamond Greyhound & Genetics, Inc.*, 819 F.2d 400, 407 (3d Cir. 1987) (abrogated on other grounds by *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271 (1988)). *See also Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 395-96 (5th Cir. 2002).

Accordingly, the Court concludes that Plaintiffs must arbitrate their claims against ICON.

Defendants next argue that the remaining claims against Farr should be stayed pending the outcome of the arbitration because those claims are inextricably intertwined with the arbitrable claims, presenting a real risk of inconsistent results. Plaintiffs failed to respond to this argument.

The FAA requires courts to "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation, at least absent a countervailing policy manifested in another federal statute." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). However, the Supreme Court has advised that, in some cases, "it may be advisable to stay litigation among the non-arbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983). Several district courts in the Sixth Circuit have found such a stay appropriate where a decision in one forum could affect the resolutions of claims in another; where the non-arbitrable claims depend on the same facts and are inherently inseparable from the arbitrable claims; or where the arbitration may resolve issues in the lawsuit and/or promote the federal policy in favor of arbitration. *See Thomas v. Right Choice Staffing Grp.*, LLC, No. CIV. 15-10055, 2015 WL 4078173, at *8 (E.D. Mich. July 6, 2015) (collecting cases). In contrast, a stay is unnecessary where the non-arbitrable claims are based on distinct projects or distinct contracts. *See id.*

Plaintiffs' non-arbitrable claims against Farr depend on the same facts as their arbitrable claims against ICON. Indeed, Plaintiffs' fraud and negligent misrepresentation

allegations lump all Defendants together throughout the Complaint. According to the Complaint, Farr is ICON's principal and the main actor who advanced the alleged fraudulent scheme under the guise of the single transaction to finance Plaintiffs' real estate project in Flint. Accordingly, the Court will stay Plaintiffs' non-arbitrable claims against Farr pending the outcome of arbitration.

### D.  Forum Selection Clause

Defendants argue, in the event the Court does not enforce the arbitration provision in the Fee Agreement, that all claims under the Fee Agreement are subject to dismissal pursuant the forum selection clause. Given that the Court will enforce the arbitration provision in the Fee Agreement as discussed above, the Court need not reach this argument.

## IV.  CONCLUSION

For the reasons set forth above, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' Motion to Dismiss (Dkt. # 20).

Defendant Brent Watson is DISMISSED from this action.

Plaintiffs shall arbitrate all claims against Defendant ICON Commercial Lending, Inc. in accordance with the parties' agreements to arbitrate.

Judicial proceedings in this matter are STAYED until such arbitration has been completed, and this case is ADMINISTRATIVELY CLOSED. This action may be reopened once any party provides the Court with notice that arbitration has been completed.


SO ORDERED.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: October 11, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 11, 2017, by electronic and/or ordinary mail.

s/Carol J. Bethel
Case Manager